ST. LOUIS CAR–COUPLER CO. v. NATIONAL MALLEABLE CASTINGS CO.

(Circuit Court, N. D. Ohio, E. D. May 27, 1897.)

PATENTS—COMBINATIONS — CONSTRUCTION OF CLAIMS — INFRINGEMENT—AUTOMATIC CAR COUPLERS.
The Lorraine and Aubin reissue, No. 10,941 (original No. 369,195), for an automatic car coupler, shows a mere reproduction of similar parts used in other couplers of the same kind (being the Janney, or M. C. B., type) for the same purpose and with the same functions. If there is any patentable novelty in the combination, it is in the exact form shown in the specifications and drawings,' and any variation therefrom in any of the parts will prevent infringement. The claims are, therefore, not infringed by a coupler made in accordance with the Tower patent, No. 541,446.

This is a bill in equity, brought by the St. Louis Car-Coupler Company, as complainant, to enjoin the National Malleable Castings Company, defendant, from further alleged infringement of a patent for an automatic car coupler averred to be the property of the complainant and for the damages arising from past infringements.

The patent upon which the suit is based is a reissued patent, issued upon the 26th of June, 1888, to Madison J. Lorraine and Charles T. Aubin, and numbered 10,941. The original patent was issued to the same patentees upon August 30, 1887, and numbered 369,195. The answer admits the issuing of the patents, but does not admit the ownership by the complainant. It avers that the reissued patent is void because the claims thereunder state unlawful extensions of the matters and things claimed in the original letters patent, that the patent is void for want of novelty and patentable invention, and that the patent is anticipated by a number of patents set out. The answer further denies infringement.

The specifications of the reissued patent in suit state the character of the invention to be as follows:

"Our invention relates to that class of car couplings known as 'vertical plane,' and having a pivoted, outwardly opening, coupling-head, or clutch, and an extended arm, or buffer. The object of our invention is to provide a vertical plane coupling free from complicated parts, locking by means of a simple automatic gravity pin, requiring no adjusting and made in one piece; to provide a vertical plane coupling, in which, when the coupling-head is unlocked and released, said coupling-head, by reason of its own weight, will turn outwardly and open, and thus automatically set itself in position to effect a coupling with a similar opposing coupling-head, which may be either open or closed; to provide an improved and simplified means of setting not to couple; to so construct and arrange the coupling-head that it will be unusually strong; and to make a coupling that will perform the work under all circumstances, as well

on the sharpest curves as on a tangent, and with the greatest variations in height of the opposing parts,—in fact. to provide a car coupling that will be simple in construction, automatic in action, and free from springs and superfluous and loose parts, that will combine strength and durability with simplicity and perfection of action."

"Fig. 1 is a plan of draw-head with coupling-head attached and closed.   .

"Fig. 2 is a plan of coupling-head detached from draw-head.

"Fig. 3 is a horizontal section, showing lower half of draw-heads separate from coupling-head.

FIG. 3

"Fig. 5 is a side view of locking pin.

FIG. 5

"Fig. 9 is a side view of two draw-heads, with coupling-heads attached, about to make a coupling with the left-hand coupling-head open and down, and the right-hand coupling-head closed, up, and locked, and showing vertical longitudinal section of draw-head through line, X⁹, Y⁹, Fig. 10.

FIG. 9

"Fig. 10 is a horizontal longitudinal section of two opposing draw-heads, with coupling-heads attached about to make a coupling, with left-hand coupling-head unlocked and open, and the right-hand coupling-head closed and locked.

FIG. 10

"A is the coupling-head, which is pivoted at its center to the draw-head, and which, viewed in position shown in Fig. 2, has a general U shape. A is the outer arm of this U, and L is the inner arm. F is a hole in top of draw-head for reception of locking pin. $F^1$ is a hole which perforates inner arm of coupling-head for purpose of receiving locking pin, and $F^2$ is a hole in bottom of draw-head for same purpose. G is a groove in inner arm of coupling-head for guiding the locking pin as hole $F^1$ moves from or toward it. H is locking pin (said locking pin can be either oblong, round, or square), and $I^2$ is a knob projecting from side of locking pin to keep it from being drawn out of hole, F. J is the drawbar. M is chain for raising and supporting locking pin. N is a lever arm attached to chain for operating coupling pin. O is the car body. S is recess in arm, L, made to receive rib, $S^1$, which is cast to side of draw-head. The outer arm, $A^1$, of the coupling-head, or knuckles, is partially divided by a horizontal slot, and has a hole, C, extending through both parts. This arrangement is to receive and secure the link and pin when coupling with a common draw-head. D, in Fig. 1 and Fig. 2, is an inclined groove in the coupling-head, made for the projecting knob or pin, $D^1$, to travel in, and automatically open the coupling-head. When two similarly constructed draw-heads approach each other, as shown in figures 9 and 10, the arm, $A^1$, of the closed coupling-head, encounters the end of the arm, L, of the opposing and open coupling-head, moving the open coupling-head inward, and, with the aid of the concaved surface of the buffer arm, B, forces the coupling-head completely around to the inner head by this movement. As the arm, L, of the coupling-head is being pushed inward, the pin, H, which rests on the top of that arm, is guided by the groove, G, towards the hole, $F^1$, falls through it, and into the hole, $F^2$, and thus secures and locks the coupling-head."

The recess, S, fits against the rib, $S^1$, when the arm, L, is pushed completely inward, giving the coupling-head a solid bearing against the draw-head when it is locked by the pin, H. In uncoupling by the use of the lever, N, and the chain, the brakeman at the side of the car lifts the pin, H. The coupling-head then has nothing to retain and support it, and, as the opposing head draws away from it, the action of gravity draws the coupling-head down into the vacant space beneath, and, as it falls by reason of the top of the groove, D, traveling down and across the knob and pin, $D^1$, the coupling-head turns and opens, and is set into position for another coupling. This occurs whether the coupling-head be coupled with its fellow, or simply closed and not coupled. While the coupling-head is open, the pin, H, rests on top of L, in the groove, G. Should it be necessary to set it so that the coupler will not couple, the lever arm is raised and pushed or pulled on top of the block, P, and, as this keeps the pin, H, in the raised position, the coupling-head cannot be locked, and the coupling cannot be effected.

The object of pivoting the coupling-head at its center is threefold: First, if the coupling-head was otherwise pivoted, by reason of its shape, when uncoupled, the arm, L, of the unlocked head, would bind the arm, $A^1$, of its neighbor, and prevent uncoupling with facility, and this it would do especially on curves; second, if the coupling-head were pivoted back of its center, or in the arm, L, it would then be necessary to open both heads to either couple or uncouple, which would be unnecessary and faulty; third, if the coupling-head

were pivoted in its forward arm, A¹, when the coupling-head was entirely open, the arm, L, would then come entirely without the draw-head, and there would be nothing to support the locking pin in a raised position, and it would accordingly fall, and, when coupling, it would be necessary to construct some mechanism to automatically raise said locking pin, which would be complicated and is unnecessary. The specification further states that when the coupling-head is removed from draw-head, which can be done by withdrawing the pin, E, the remaining portion of the construction constitutes a sufficient means of itself for coupling with any center-draft coupling; that is, the link may be inserted in the coupling-head, and secured by the coupling pin reaching down through F, F¹, and F².

The claims of the patent which are said to be infringed are the 1st, 3d, 6th, 7th, 8th, 10th, 11th, 12th, 18th, 19th, and 20th, as follows:

"(1) The combination of the U-shaped coupling-head pivoted at its center, the draw-head, and the automatic locking pin, for the purposes set forth."

"(3) The combination of the U-shaped coupling-head, the groove, G, the draw-head, the locking pin resting on top of the arm, L, when the coupling-head is open, and falling through the holes, F¹ and F², when the coupling-head is closed, and the lever arm and chain, substantially as described."

"(6) The combination of the U-shaped coupling-head, having the recess, S, the locking pin engaged with the rearward arm of said coupling-head, and the draw-head having the rib, S¹, which fits in the recess, S, only when the coupling-head is closed, for making the coupling-head firm and secure when locked.

"(7) The combination of a coupling-head turning laterally on its pivot, and having an external arm extended to engage with and grip a like fellow, and a rearward arm intended to engage with some locking mechanism, with a draw-head carrying a common gravity, vertically moving, locking pin, said automatically locking pin riding directly upon such rearward arm when opened, and locking such inner arm by dropping through a hole perforated in the inner arm of the coupling-head, substantially as described.

"(8) The combination of two similarly constructed draw-heads having U-shaped, pivoted, automatically opening coupling-heads and the automatic locking pins, substantially as described, for the purpose of making an automatic coupling."

"(10) The combination of a coupling-head, the draw-head, the groove, G, the locking pin resting on top of the arm, L, when the coupling-head is open, and falling through the holes, F¹ and F², when the coupling-head is closed, and the lever arm and chain, substantially as described.

"(11) The combination of the draw-head, the pivoted coupling-head, and the locking pin, said locking pin resting upon the inner arm of the coupling-head when the coupling-head is opened, and riding upon said inner arm when the coupling-head is turned to be closed, and said inner arm being grooved to receive and guide the locking pin.

"(12) The combination of the draw-head, the pivoted coupling-head, and the locking pin, said locking pin working vertically in a perforation in the draw-head, and resting directly upon the inner arm of the coupling-head when the coupling-head is opened, riding directly upon said inner arm when the coupling-head is turned to be closed, and dropping through said inner arm to secure said coupling-head when closed."

"(18) The combination of the draw-head, the pivoted coupling-head and the vertically moving locking pin; the inner arm of said coupling-head, when the coupling-head is closed, being held by said pin, and also interlocked with the draw-head at a point between the location of said locking pin and the coupling-head pivot, for the purpose described.

"(19) The combination of a coupling-head turning laterally upon its pivot, and having an external arm intended to engage with and grip a like fellow, and an inner arm intended to engage with some locking mechanism, with a draw-head carrying a common gravity, vertically moving, locking pin riding directly and solely upon such inner arm when the coupling-head is open, and dropping to lock it when closed, substantially as described.

"(20) The combination of two similarly constructed draw-heads having pivoted, automatically opening, coupling-heads, and the automatic gravity-locking pins, substantially as described."

In the original patent, of which this is a reissue, the coupling-head was described as follows: "A is the coupling-head, which is pivoted at its center to the draw-head (said center being in direct line with prolongation of radius, a. b. of circle, a, b, c, and said radius being at right angles to the line of the draft), and which, viewed in position shown in Fig. 2, has a general U shape." The clause in parentheses is omitted in the reissue. The first 8 claims of the reissued patent are substantially the same as those of the original patent. The remaining 12 were not contained in the original patent, and the claims alleged to be infringed, therefore, the 1st, 3d, 6th, 7th, and 8th, were contained in the original patent.

The defendant's device is made in accordance with a patent issued to C. A. Tower for a car coupler, June 18, 1895, and numbered 541,446. The Tower patent was avowedly an improvement on the patent issued to the same patentee June 5, 1894, and that was an improvement on the patent issued to the same patentee October 24, 1893, No. 507,511.

Fig. 1 of the patent shows a horizontal section of two couplers,—one closed, and the other open, about to couple.

Fig. 4 and Fig. 5 show the locking device,—Fig. 4 when the coupling-head is locked, and Fig. 5 when the coupling-head is open.

The draw-head is of the same shape as that of the complainant's coupler, and all of that class of couplers known as the "Janney Type." In one of the prongs swings the coupling-head, and the other prong is used as a buffer bar. The knuckle or coupling-head is formed with an outer arm, b, and an inner (and preferably longer) arm, or tail, c, which project substantially at right angles to each other, and the rear side of the tail is formed into a hook, d. In order to hold the knuckle in locked position (the position shown in Fig. 4, and at B in Fig. 1), an angled locking and opening piece is set within the coupler head, and shown most clearly in Fig. 4 and Fig. 5. The upper and transversely extending member, or arm, e, of this angled piece reaches over the tail of the knuckle. Its dependent block or head, 7, is adapted to fit in front of and to lock the knuckle when in closed position, and its dependent arm, f, which extends downwardly at the rear of the knuckle, and is substantially upright when the knuckle is in locked position, passes through a guide hole, g, in the floor of the coupler. When the knuckle is locked, the head, 7, of the angled piece fits between the front side of the knuckle tail and the shoulder, h, on the coupler-head; but when the brakeman raises the angled piece by a link, or lifting rod, 8, it is raised above the knuckle, and out of its path of motion. The notch, i, on the upward side of its member, e, engages a projecting rib or shoulder, 9, on the coupler-head, which shoulder acts as a fulcrum upon which the arm, f, acquires a radial motion against the rear side of the tail of the knuckle, moving it outwardly into the open space. The end of the arm, f, will then drop upon and be supported by the bottom or floor of the draw-head until the knuckle tail is swung back and the operation of locking again succeeds. In this operation the rear side of the knuckle tail engages the arm, f, and moves the angled piece so as to carry the arm back into a vertical position until its lower end comes into register with the hole, g, and then the angled piece will drop by gravity, its arm, f, entering the hole, and its head, 7, adjusting itself in front of the knuckle tail, and locking the knuckle. As a security against the jumping of the locking piece. the opposite sides of the head, 7, are not in parallel, vertical planes, but with downward, divergent surfaces.

Munday, Evarts & Adcock and Henry W. Post, for complainant.
M. B. Philipp, T. W. Bakewell, and E. A. Angell, for defendant.

TAFT, Circuit Judge (after stating the facts as above).    In order to determine how broad and liberal a construction is to be put upon the reissued patent of the complainant, it is necessary to examine the state of the art at the time of its issue.    The patent in question is a mere improvement on a well-known form of car coupler.    As early as the 29th of April, 1873, a patent was issued to E. H. Janney, No. 138,405, for a car coupler which established a type.    It had a forked draw-head, one arm of which operated as a buffer, and to the other arm was pivoted a knuckle or coupling-head consisting of two arms, one adapted to hook with a similar arm upon a similar coupling-head on a fellow coupler, and the other when the coupling-head was open, swinging out in a position where it would be struck by the arm of the opposing coupler and driven back into a hollow draw-head, there to be latched by a spring latch firmly against the side of the draw-head, and thus holding the outer arm or hook of the coupling-head in engagement with the corresponding hook of the coupling-head of the opposing coupler.    The form may be gathered from the following figures taken from the drawings of the patent:

Various improvements were made by Janney on his coupler in the matter of the locking device and the form of the draw-head and coupler, one in 1874, another in 1878, another in 1879, and another in 1882.    On the following page are Figs. 1 and 2 of the drawings of the Janney patent of 1879.    The locking device is a spring latch embracing the tail or inner arm of the knuckle head.

In the Janney patent of 1882 the form of the coupler is substantially the same, but the locking device is a locking pin extending downward through a hole in the top of the draw-head, and fitting in a corresponding hole in the same. The pin has an inclined face upon one side, so that the end of the lever arm, when it is swung in a backward direction, strikes the inclined face, lifts the locking pin until high enough to permit the arm to pass beneath into the recess behind it, when the pin returns to its normal position, either by gravity or by use of a spring, and locks the lever arm. The form which the Janney coupler has now assumed may be seen from the Figs. 1 and 3 of the patent given on the following page.

It will be seen from the foregoing that the device of the patent in suit is, if any invention at all, a mere improvement upon a well-known type of car couplers. The number of patents upon car couplers is about 1 per cent. of all the patents issued by the patent office, and there are to-day 6,500 patents for such devices. In 1885

Fig. 1.

Fig. 2.

Fig. 3.

the Master Car Builders' Association, an association made up of all the car builders of the United States, held a convention for the purpose of bringing about a uniformity in the car couplers to be used, and established a model or contour, to which all manufacturers and inventors were invited to shape their couplers. That contour was suggested by and taken from the figures of the Janney patent, and is given on the following page.

The model chiefly related to the side of the draw-head, and the size of the knuckle, and the length of the outer arm of the knuckle. It did not attempt to fix exactly the position of pivot on the knuckle with reference to the rear arm, nor did it make any requirements with respect to the form of the tail or inner arm of the knuckle, or the character of the locking device to be used. The outward contour or form of the coupler described in the patent in suit, as well as that of the alleged infringement, is according to the requirements of the Master Car Builders' Association, and is called, therefore, a coupler of the M. C. B. type.

We must begin the consideration of the questions in this case, therefore, with the full understanding that couplers of the general contour of the patent in suit were old before it was applied for; that the forked draw-head, with one arm to act as a buffer, and the other for the purpose of pivoting a coupling-head or knuckle having two arms, one to hook and the other with a tail which should lock the latch in the interior of the hollow draw-head, was old, and therefore that the only possible patentable novelty in a coupler of the M. C. B. type must be found in the shape of the tail of the coupling-head in

the relation of the tail to the hook or outer arm, and in the locking device. The general combination of the forked draw-head, the pivoted coupling-head or hook for engagement, with a fellow on an opposing coupler, with means in the interior of the draw-head for locking the tail of the coupling-head, was as old as the Janney coupler of 1873. It is contended on behalf of the complainant that the device covered by the patent in suit is novel—First, in the shape of the coupling-head described as U-shaped; second, in the pivoting of the coupling-head opposite the gap between its two arms or in its center, so called, which makes it possible for part of the tail to project into the space between the arms of the draw-head when open to receive the closing of the opposing coupler, and for the other part of the tail to remain within the draw-head to support the simple gravity pin until it shall fall by its own weight into its locking position. The advantages claimed for the arrangement and shape of the parts are— First, that the parallelism and shape of the parts of the arms of the coupling involved in the U shape, either when two such couplers are coupled together, or when uncoupled, make the surface of re-

sistance to strains by striking, pulling, and pushing much broader, and thus distribute the strain more evenly throughout the whole structure; second, that the placing of the locking pin exactly in the line of draught, made possible by the shape of the coupling-head, reduces the strain by leverage against the locking device to a minimum; third, that the locking by simple gravity, without the necessity for the use of any device for lifting the pin out of the rearward path of the tail, reduces the danger of a quick rebound of the tail before the locking pin can come to its locking position; fourth, that the recess, S, of the coupling-head, and the rib, $S^1$, of the draw-head, secure a solid bearing against the back side of the draw-head when the coupling-head is locked, such that, even if the pivot of the coupling-head be lost, the coupler will not open, but will continue to perform its function.

Let us examine the prior art, with the view to determining first the novelty of the shape of the coupler; secondly, the novelty in the place of pivoting the same; third, the novelty of the locking device; and, fourth, the novelty of the auxiliary locking device contained in the recess, S, and in the rib, $S^1$, in car couplers.

First, as to the U-shaped knuckle or coupling-head.

In the patent issued to Phillip Hien, dated July 26, 1881, No. 244,-895, which was a car coupler of the M. C. B. and Janney type, it is admitted by the expert and the counsel for the complainant that the coupling-head was U-shaped, and this is manifest from Fig. 2 and Fig. 3 of the patent, which we give below:

FIG. 2.

FIG. 3

Again in the Kling patent, which was applied for February 26, 1887, before the original patent of complainants was applied for, the knuckle or coupling-head is U-shaped, if by that is meant a parallelism between outer and inner arm of the coupling-head, which I understand to be the meaning claimed by the expert and counsel for the complainant.

So in the Wincman patent issued January 29, 1884, the knuckle or coupling-head is U-shaped, as may be seen by reference to the figures taken from the patent drawings, which we give below:

So in the English Talbot patent, which is not of the M. C. B. or Janney type, but which has a coupling-head working in the forked draw-head, and pivoted to one of the arms, the knuckle is U-shaped, as may be seen by Fig. 2 of the drawings of the patent given on the following page.

FIG. 2.

There are other patents which have the same U form, but the fore-going are sufficient to show it was not new when complainant's patent was applied for.

Secondly, were there any coupling-heads which were pivoted at the center? It is a little difficult to tell what is meant by "pivoting at

the center," but complainant's expert attempts to define it as pivoting at a point opposite to the gap between the arms. In the English patent, already referred to, the coupling-head is pivoted exactly opposite the gap. So it is in the Kling patent. But it is said that in these patents the shape and pivoting are not such as to permit part of the tail to protrude into the fork of the draw-head to receive the blow from the arm of the opposing coupler, and, on the other hand, to permit sufficient of the tail to remain inside of the draw-head to uphold the locking pin or locking device on the tail while the coupler is open and is being carried into the point where the pin drops through the tail and locks it. But the same thing is true of the Wineman patent, already referred to and described. In it part of the tail of the coupling-head protrudes, when open, into the fork of the draw-head, and there receives the blow from the forward arm of the opposing coupler; while upon the other part of the tail rides the locking piece, ready to fall in front of a part of the tail in its rearward movement, and lock it. Indeed, the locking device, by which a gravity pin is carried on the tail of the coupling-head while it is open and is dropped into a locking position when the coupling head is closed, is seen in several other couplers of the M. C. B. type. Thus it appears in the Dowling patent, No. 339,156, and in the Harrington patent, No. 376,713, both of which are M. C. B. couplers. It also appears in the Gray patent, No. 261,702, which is not of the M. C. B. type, though it might be easily adapted thereto. It was issued July 25, 1882. The feature referred to is evident from Figs. 5, 6, and 7, which we give below:

The little plate, E, and latch or catch plate, is a piece really cut off of the tail of the coupling-head, but fitted to it with a hole through it, in which the gravity pin registers and drops through into the tail

of the coupling-head, and into the bottom of the draw-head. The separation of the latch from the tail does not affect the principle, and this device plainly suggests the means for locking with a gravity pin which is shown in the complainant's device. The only difference is in the groove upon the tail of the complainant's patent, made for the purpose of more certain registry by the pin with the hole into which it is to fall. But the introduction of such a groove did not require invention. It is such an obvious device, and so often used in analogous cases, as not to constitute any patentable difference.

The use of the rib on the tail of the coupling-head, and the corresponding recess on the side of the draw-head, in order to make the bearing on the coupling-head solid when locked, we find in the Janney patent of 1881. This is shown in Fig. 3, below, at b and a¹.

Fig. 3.

The same thing appears in the patent of Dowling, No. 379,888, which, though dated March 20, 1888, was issued on the application filed September 17, 1886, and prior to the application for the present patent. It is seen in Fig. 6 of the Dowling patent, as shown below at L.

Fig. 6.

Nor was it a new thing, at the time this patent was applied for and issued, in couplers of the M. C. B. type to have a locking device in the

line of the draught or in the longitudinal center line of the draw-head. This is shown in the Kling patent, already described, in which the strain is on a center gravity pin, just as in the patent in suit. It also is shown in the Thurmond car coupler, and appears in Figs. 1 and 2 of the patent, as given below:

D is a gravity pin with notches or inclined planes on its sides, so adjusted in relation to the tail of the coupling-head that, when the coupling-head is being closed, the tail strikes the pin, lifts it, passes under a wing of it, and, letting it fall, is locked behind it.

The automatic coupler art was not one in which a practical and successful coupler was yet to be invented when the inventors of complainant's patent entered the field. On the contrary, there were a dozen different types of such couplers in actual and profitable use. The Janney coupler is the one then and now most in use. Complainant has attempted to avoid the effect of some of the patents already referred to in suggesting features of the patent in suit by evidence that they were not practical couplers capable of successful use, but the evidence is not of sufficient weight to affect the conclusion I have reached. It

is perfectly evident, from this review of the devices which had been patented before the complainant's device was patented or applied for, that every part of complainant's coupler is old, and may be found performing substantially the same function in an automatic car coupler. There is no room for invention, therefore, except in the peculiar combination of the parts producing a new result. The additional buffing strength produced by the U shape of the knuckle claimed for the complainant's patent is not a new result, because we have the same thing in the Hien patent and in the Wineman patent, both practical couplers. The presence of the locking device in the center line of the draw-head, or line of draught, is, as we have seen, not a new result, because it appears in the Kling and Thurmond patents, and there are other patents in which the locking pin in its locking position is either in or near the line of draught. The capacity for receiving strains by reason of the auxiliary locking device, S and S¹, is, as we have seen, not new. It is possible that the adjustment of the parts in the complainant's patent, their contour, and their varying shape, lead to a better general result, including all the benefits stated by the complainant's expert. But the parts are so clearly a reproduction of similar parts used in other couplers of the same kind for the same purpose, and with the same functions, that no patentable novelty can be successfully asserted to exist in the complainant's combination, except in the exact form in which it appears in the specifications and drawings. It is a patent which, if valid at all, is entitled only to the narrowest construction, and any variation in any of the parts of the combination will prevent infringement. It is only "one in a series of improvements all having the same general object and purpose; and, in construing the claims of the patent, they must be restricted to the precise form and arrangement of parts described in his specifications and to the purpose indicated therein." Fox v. Perkins, 6 U. S. App. 200, 273, 3 C. C. A. 32, and 52 Fed. 205; Bragg v. Fitch, 121 U. S. 478, 483, 7 Sup. Ct. 978; Caster Co. v. Spiegel, 133 U. S. 360, 369, 10 Sup. Ct. 409; Boyd v. Tool Co., 158 U. S. 260, 261, 15 Sup. Ct. 837; Ney v. Ney Manuf'g Co., 37 U. S. App. 371, 16 C. C. A. 293, and 69 Fed. 405; Miller v. Eagle Manuf'g Co., 151 U. S. 186, 207, 14 Sup. Ct. 310; Wells v. Curtis, 31 U. S. App. 123, 158, 13 C. C. A. 494, and 66 Fed. 318.

Coming, then, to compare the patent in suit with the alleged infringement, we find, first, that the coupling is not exactly U-shaped. It is a curved tail, which makes the whole piece almost resemble an S. Considering the very great variety in the shapes of the tails of the coupling-heads in previous patents, the difference in shape of the two tails here under consideration is quite enough to prevent infringement. The pivot in the alleged infringement is not exactly opposite the gap, though nearly so. The locking device of defendant is a most ingenious one, and in its normal operation does not involve the riding of the locking block upon the tail of the coupling-head, though this may occur exceptionally. The riding is generally done by the lower arm of the locking block in a groove in the bottom of the draw-head. The locking block is not a common gravity pin like that described in the patent of complainant, but is quite different in

form, and, while it does fall by gravity to do the blocking, it has other functions. A valuable one is the office and capacity it has for ejecting the tail of the coupling-head whenever the chain attached to it is pulled up by the brakeman. In the complainant's patent, after the pin is pulled, the tail of the coupling-head, by force of gravity working down an inclined plane, opens and remains open until it is forced back. This is a truly automatic opening. The opening of the defendant's coupling-head is by direct action of the brakeman through the locking block in lifting the same out of the locking position. The tail of the locking block acts directly upon the coupling-head, and by the radial motion given to it by the pull of the brakeman it thrusts the tail out through the opening of the draw-head. This is not an automatic opening like the complainant's. Gould Coupler Co. v. Trojan Car-Coupler Co., 21 C. C. A. 97, 74 Fed. 794.

These general remarks as to the difference between the device of the complainant and that of the defendant, together with the conclusion that the claims of the complainant's patent are to be narrowly construed, dispense with the necessity of critically examining each of the claims, and comparing them with the alleged infringement. It suffices to say that any construction of any of the claims relied on which would include the defendant's device, or any combination of parts therein, would render the claim void for want of patentable novelty or invention in view of the prior art.

In reference to the first claim, defendant's coupling-head is not U-shaped, and is not exactly pivoted at the center, nor is the automatic locking pin the same as in the complainant's patent. In reference to the third claim, defendant's coupling-head is not the same, the groove, G, is not the same, and the locking pin is not the same, as in complainant's device. In reference to the sixth claim, the combination of the recess, S, with the shoulder, $S^1$, of complainant, is not found in the defendant's device. In the alleged infringement the tail of the coupling-head engages the tail of the locking pin, and that locking pin strikes against a shoulder in the side of the draw-head. Considering the fact that such devices are shown to be common in prior patents, this difference between the two patents is quite sufficient to prevent infringement by the defendant's analogous devices for rendering the coupling-head firm and secure when locked. Limiting the 7th and 8th claims, the 11th, 12th, 18th, 19th, and 20th, as we have done the previous claims, it is quite apparent that there is no infringement.

The defendant makes the point that the complainant does not show a proper title. I do not think it necessary to state the facts upon which this controversy arises. They seem to me to show that, even if the complainant has not a legal title, it has at least an equitable title, upon which it might obtain relief if it was otherwise entitled to it.

In view of the conclusion reached that there is no infringement, I do not deem it necessary or proper further to discuss this issue. Nor is it necessary to consider whether any of the claims of the reissue are void because an undue enlargement of the claims of the original patent. The bill is dismissed, at the costs of the complainant.