## GOULD COUPLER CO. v. TROJAN CAR–COUPLER CO.

(Circuit Court of Appeals, Second Circuit.   May 27, 1896.)

1. PATENTS—"AUTOMATIC" ACTION.
   The word "automatically" cannot be properly applied to describe a method of throwing out the hooks of a car coupler by means of a rod connecting therewith and running to the side of the car, and there turned by the application of physical force by a brakeman.

2. SAME—INFRINGEMENT—CAR COUPLERS.
   The Browning patent, No. 254,106, for an improvement in car couplers of the Janney type, which provides a means for automatically opening and holding open the coupler, analyzed and construed, and *held* not infringed by the Trojan coupler.

Appeal from the Circuit Court of the United States for the Northern District of New York.

This is an appeal from an order for injunction pendente lite made by the circuit court, Northern district of New York, in a suit brought for alleged infringement of United States patent No. 254,106, granted February 28, 1882, to Clinton Browning, and now owned by complainant. This patent was sustained by the same court in a litigation between the present complainant and Pratt & Letchworth; the coupler manufactured by the last-named firm, and known as the "Pooley Coupler," being held to be an infringement of the Browning patent. An elaborate opinion was filed in the Pratt Case (70 Fed. 622), but we find none in the record of the case now on appeal. Such record contains all the testimony taken in the Pratt Case, and much additional evidence presented in affidavits.

Fredk. P. Fish and Edmund Wetmore, for complainant.
Edwin H. Brown and Fred. H. Betts, for defendant.

Before WALLACE, LACOMBE and SHIPMAN, Circuit Judges.

LACOMBE, Circuit Judge (after stating the facts). The defendant contends that the patent in suit is anticipated, that it lacks utility, and that it presents no patentable novelty. In support of this contention there have been introduced many prior patents, and much evidence, expert and other. It will not be necessary to enter into any extended examination of this branch of the case. The single claim of the patent reads as follows:

"In a car coupling, composed of a bifurcated head and rotary interlocking hook, the combination, with said rotary hook, by means substantially such as described, for automatically opening and retaining said hook in proper position for coupling."

Of this claim the circuit court in the Pratt Case (70 Fed. 622) says:

"The claim covers both the feature of opening the hook and holding it open in a position for coupling. Of this there is no doubt. All of the experts agree upon this proposition. The complainant's expert says, and says correctly, that a coupler which has means for accomplishing but one of these results does not infringe."

No one upon this appeal disputes the accuracy of this conclusion, and in consequence the question of infringement is much simplified. It will be unnecessary to determine to what extent the devices of defendant operate automatically to retain the opened hook in proper position for coupling, because, unless it can be shown that defendant's device automatically opens such hook, no infringement is shown. As indicated in the claim, complainant's coupler belongs to the general class of couplings which are composed of a bifurcated head and rotary interlocking hook. Defendant's belongs to the same class, the prototype of which is the Janney coupler. This Janney coupler is thus described by one of the experts:

"It consists generally of two drawheads (one on each car), each of which has a forked arm, to which is pivoted the knuckle or corner of an L-shaped hook, capable of swinging to one position to lock with the hook of the opposing drawhead, and held in that position by a locking block or detent, and also capable of swinging to another position when the detent is withdrawn or turned to one side, so as to uncouple from the hook of the opposing drawhead."

Apparently all the couplers of this class, certainly the Janney, the Pooley, the Browning, and the Trojan, are automatic couplers; that is, after the parts have been put in proper position, they will, unless accidentally disarranged, complete the act of coupling as the cars come in contact, without further intervention of the trainman. In the old form of link and pin coupling the trainman had to guide the link into its proper recess in the drawhead, and when it had entered he locked it by inserting the pin. With automatic couplers of this Janney class, as the cars come together each stationary forked arm strikes the rotary L-shaped hook or "knuckle," causing it to revolve so as to hook into the opposing "knuckle," and as soon as engagement is complete the locks or detents, which prevent the rotary hooks or knuckles from swinging back, drop into place. The bond of union, therefore, between the two cars is the interlocked knuckles held in place by the detents, and, barring accidents, it will hold the cars together as long as the detents remain in place. The first step towards uncoupling the cars is necessarily the lifting of this detent from the position in which it holds the knuckles against rotation. When this is done the coupling is unlocked. In the original Janney coupler, after it is unlocked by lifting the detent, the remaining parts remain in the position in which they were until some further exercise of the human will, applied directly or indirectly by some further exertion of human power, causes them to move. If, after the detents are unlocked, the two cars are drawn apart, the rotary knuckles will swing, each the other, into an open position, thus severing the bond of union between the cars and completing the uncoupling. Or, the detents being unlocked, the trainman may take hold of the rotary knuckles with his hands, and pull them open; or again, he may reach them with a long-handled rod with a poker-shaped hook on the end, and pull them open. No one pretends that such operation would be an "automatically opening" of the hooks. In the Trojan coupling a rod is permanently fastened to the end of the car running from the recess back of the hook to the side of the car. It is provided with a finger near the end in the recess, and

when the rod is pushed inwards the finger presses against the inner end of the knuckle, and, if the detent is not in place, causes the knuckle to swing open. It is difficult to see upon what theory it can be contended that there is an exhibition of automatic action when a man of his own volition pushes a door open with a rod, and no exhibition of automatic action when the same man of his own volition pulls the door open with a hook. It is no doubt true that the same rod operates the detent. The rod is bent at right angles to itself at the side of the car, thus forming a handle by which it can be revolved. When it is thus revolved it raises the detent; but the raising of the detent does not set in motion any of the remaining mechanism. If the operator goes away after revolving the rod, defendant's mechanism does not open the hook at all. If the hook be opened by defendant's mechanism, it is only because of a separate act of volition on the part of the operator, put into action by a new and independent application of his physical strength to the rod, moving it in a new and different direction.

If the word "automatically" in the claim is to be given its ordinary and general meaning as used in common speech, defendant's device does not infringe. It is contended, however, that it is used in the patent with some new and peculiar meaning. It will be desirable, therefore, to consider the specification of the patent more in detail, and to look somewhat into the prior state of the art, in order to see if there is any justification for the contention that the word "automatically" is to be construed so broadly as to cover a device for opening the rotary hook, which is so emphatically unautomatic as is the defendant's. Much weight was given on the argument to the circumstance that Browning, the patentee, was not represented by solicitor before the patent office, and that he drew his own specification and original claims. The single claim finally allowed was phrased by the patent office, but the word "automatically" which it contains was Browning's own suggestion. It was prominently present in every form of claim which he submitted. The reason why he used it, and the meaning he understood it to convey, seem to be reasonably apparent upon reading his specification, which was not amended in the patent office. It is difficult to see why the circumstance that Browning had no solicitor should lead to any peculiarly liberal construction of his patent, in view of the fact that the description of his invention is singularly clear, complete, intelligible, and unambiguous; an agreeable contrast to many which come before this court where the inventor has been represented by solicitor. The material parts of this specification are as follows:

"My invention relates to improvements in car couplings in which a rotating hook is hinged to a drawhead, and the coupling is effected by the hook rotating inwardly, of which the Janney coupling is a representative, patented February 25, 1879, No. 212,703, the drawings of which I have copied and used in illustrating my invention. The objects of my improvements are to rotate the rotary hook automatically to the desired position for the purpose of effecting the coupling; second, to automatically retain the rotary hook in proper position until required to rotate in the act of coupling. In the Janney coupling the rotary hook, when not in use [i. e. when not coupled with another car

and locked in place], having no retaining device by which it can be held in a certain position, is left free to rotate to any uncertain point by the jarring of the cars or by any object with which it may come in contact otherwise than by the coupling process. The object of my invention is, further, to overcome this very troublesome defect, and to hold the rotary hook in a certain position, so that the coupling of cars can be accomplished with greater facility and less danger of breakage, which is often occasioned by both hooks being closed, or partially so, when the cars are brought together; also with less liability to bodily accidents than when the couplings are manipulated by hand. I attain these objects by the two following devices, illustrated in the accompanying drawings, which I shall proceed to describe in detail."

The detailed description shows drawheads of the Janney type, each with a rotary hook. The rotary hook is locked by a pawl, the pawl being operated by a lever connected to and operated by another lever projecting through and above the platform of the car. Upon the outer circle of the knuckle of the rotary hook there is arranged an elastic strap and a spiral spring, having sufficient tension to rotate the hook from its closed position to the open position, and to retain the same in the last-named position as the proper one for admitting the opposing hook and successfully coupling cars. The second device shows a lower knuckle, having a spiral incline and a rotary hook having a corresponding incline. "These inclines move upon each other in the act of rotating. The rotary hook moves upon the incline in the act of closing until it reaches nearly the highest point of the incline. Upon being released by the pawl, it rotates outwardly, dropping to (the lowest) point of the incline, and (the open) position; this outward rotation being accomplished by its own gravity, consequently occupying the lower position until force is applied to change it, thus avoiding the dangers and delay of placing the rotary hook in position by hand." It is evident that each of the mechanisms described by Browning, whether it contained the spring or the incline, became operative as soon as the detent was unlocked, without any further act of the trainman, and each remained operative, by reason of its own motive force, so long as the detent remained unlocked. Browning did not confine himself to the spring or to the incline as the source of this motion, for he concludes the specification with this clause:

"I do not claim any particular device for accomplishing the rotation and retaining of the rotary hook, C, or its equivalent, as the same can be accomplished in various ways."

It is urged on behalf of Browning that his improvement was most meritorious, because it tended to save trainmen from the risk of losing life or limb. It is contended by the defendant that in practice it does not operate efficiently in the way the specification indicates, that the spring or elastic strap is liable to fracture or distortion, and that the inclines become clogged with rust. Conceding, however, that it does all which the specification calls for, and that to the extent of its expected capabilities it does operate to save trainmen from some of the risks to which they were before exposed, that is no reason why it should be construed to cover any other operation than that which was evidently in the in-

ventor's mind, and which he plainly expressed in his specification. When two cars are coupled together, and it becomes necessary to uncouple, the first step is the unlocking of the rotary hook. This is done by raising the detent, and, before Browning, devices were shown whereby the detent was raised by operating a rod which ran horizontally to the side of the car. Before Browning, it was necessary for the trainman to be personally present in order to raise the detent, and that necessity still exists. Before Browning, the trainman could raise the detent without placing either his body or his arm between the deadwoods of the coupled cars, and the same condition of operation still remains. Before Browning, when the cars had been thus unlocked, it was not necessary for the trainman to step between the cars, and pull the rotary hooks open with his hands; the separating movement of the cars would do that. There was no call for any new device in order to make it a safe operation to uncouple cars; safe, at least, against any risks consequent upon interposing any part of the person between the deadwoods. When the cars drew apart, they opened the rotary hook (or hooks, if both were unlocked) into such a position that if, while still in such position, the cars were brought together again, they would automatically couple. The difficulty and the danger was connected, not with the uncoupling, but with the coupling. The "very troublesome defect," as Browning calls it, was this: That the open position in which a rotary coupling hook was placed by the separation of the cars which drew its head over the engaging hook, thus swinging one or both open, could not be maintained. The rotary hook was "left free to rotate to any uncertain point by the jarring of the cars, or by any object with which it may come in contact otherwise than by the coupling process." When a car, therefore, equipped with the original Janney coupler, had been uncoupled, and subsequently was approaching or being approached by another car, it was necessary for the trainman to look at it, and see if the rotary hook was still open. If it were not, which would frequently be the case, it would then be necessary for him to pull it out either with his hands or with a hand hook, and this was the operation the risk of which Browning sought to avoid. The means he devised and described were such as operated wholly irrespective of the trainman. Whenever a jar or an accidental contact threw the rotary hook inwards from the open position in which it was left at the last uncoupling, then either the stored-up power of the spring or the force of gravity operating on the inclines, without the intervention of the trainman, without his volition, without even his knowledge, began at once to work of its own motion to restore the hook to its proper position. Should the device work in practice as it does in theory, there would be no necessity for the trainman to be present immediately before coupling; automatic mechanism would at all times insure the hook being thrown into and retained in its open position. Once let the detent be lifted, and this stored-up power becomes continuously operative, not only without any further intelligent action on the part of the trainman, but even against his will, so to

speak, for when he has once unlocked the detent there is nothing in the mechanism which he can avail of to stay the instant and continuous action of this self-acting force. This is the precise device which Browning has described in clear, intelligent, and unmistakable language in his specification, and it would be difficult to find in the English language a phrase which more aptly, accurately, and comprehensively describes it than that used in the claim, "automatically opening * * * said hook." This feature is absent from the Trojan coupler. When the trainman has unlocked the detent, he has not thereby released and set in motion any independent mechanism. If he then departs, the hook is free to rotate as the cars come apart, but no act of his throws it open. If he pushes the rod, forcing the finger against the knuckle and thus throwing the hook open, that is no part of the unlocking, no necessary sequence of it; it is a new act of the human will; an additional motion imparted by direct and positive action of the human muscles applying new force in a new direction. Moreover, with the Trojan coupler, when the jarring of the cars or accidental and undesired contact has thrown the rotary hook inward out of the proper position for coupling, there is no automatic power in the mechanism which will restore it to place. The trainman, as of old, with the original Janney, has to look and see if the hook of an approaching car is in proper position. If it be not, there is no mechanism which will take his place, will appreciate the situation and do what is required; his intelligence is necessary to discover the defect; his volition is necessary to undertake its remedy, and his strength is required to restore the hook to its proper position. He does not, it is true, apply his strength by pulling the knuckle open with a poker hook which he carries in his hand, but he does apply it by a push upon the rod permanently affixed to the car, and which engages by its finger with the inner side of the knuckle, but this certainly is not an "automatic opening," within any ordinary meaning of that phrase, and, as it seems to us, not within any unusual meaning which the state of the art or the language of specification will warrant reading into the claim.

The order of the circuit court is reversed, with costs of this appeal.